Steven WYCOFF, Appellant,

v.

Lou V. BREWER, Warden of the Iowa State Penitentiary, Norman Ellandson, Director of the Iowa Bureau of Adult Corrections, and Kevin Burns, Commissioner of the Iowa Department of Social Services, Appellees.

No. 77–1586.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 10, 1978.

Decided March 23, 1978.

Rehearing Denied April 12, 1978.

---

Charles A. Pulaski, Jr., Prisoner Assistance Clinic, Iowa City, Iowa, on briefs for appellant.

Stephen C. Robinson, Asst. Atty. Gen., Des Moines, Iowa, argued for appellees; Richard C. Turner, Atty. Gen., Des Moines, Iowa, on brief.

Before BRIGHT, STEPHENSON and HENLEY, Circuit Judges.

HENLEY, Circuit Judge.

This is an action for injunctive relief and damages brought by Steven Wycoff in the United States District Court for the Southern District of Iowa against Lou V. Brewer, Warden of the Iowa State Penitentiary (hereinafter at times called simply the Penitentiary), and against Warden Brewer's superiors, Norman Ellandson, Director of the Iowa Bureau of Adult Corrections, and Kevin Burns, Commissioner of the Iowa Department of Social Services.[1] The plaintiff claims that during 1973 and 1974 while he was an inmate of the Penitentiary prison authorities acting under color of state law deprived him of rights guaranteed to him by the fourteenth amendment to the Constitution of the United States, which amendment incorporates by judicial construction certain of the first ten amendments to the Constitution. Specifically, plaintiff complains that between July 2, 1973 and August 22, 1974 he was unconstitutionally confined in "administrative segregation," and that part of that time was spent under extremely rigorous conditions in "strip cells." Jurisdiction was properly predicated upon 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983.

The complaint in the case represented a consolidation of five previous complaints filed by or on behalf of plaintiff. It was filed in 1975 on plaintiff's behalf by personnel of the College of Law of the University

---

1. It appears from the record that the Penitentiary is under the immediate supervision of Warden Brewer, who has been Warden of the institution for a number of years. The Penitentiary is within the jurisdiction of the Iowa Bureau of Adult Corrections, which is an agency within the Iowa Department of Social Services.

of Iowa and was assigned to the docket of Chief (now Senior) District Judge William C. Hanson. The defendants answered in due course and denied that plaintiff was entitled to relief.

Judge Hanson held an evidentiary hearing in the case in February, 1976. Thereafter full post-trial briefs were filed and on April 21, 1977 Judge Hanson filed extensive findings of fact and conclusions of law. He found that plaintiff was not entitled to any relief either by way of injunction or by way of damages and dismissed the complaint. This appeal followed.

■ The suit was filed and prosecuted as an individual and not as a class action. In the course of the argument before us it developed that plaintiff is no longer an inmate of the Penitentiary, having been transferred to the Missouri State Penitentiary. In view of that development, his claim for injunctive relief has become moot. It is necessary, however, for us to consider whether the district court erred in dismissing the complaint as to all of the defendants to the extent that plaintiff sought pecuniary damages.[2]

## I.

By way of introduction we will make some general statements about the Penitentiary and about conditions and practices that prevailed therein during 1973 and 1974. Hopefully, not all of those conditions and practices prevail today.[3]

The Penitentiary is located at or near Fort Madison in Lee County, Iowa, which is in the extreme southeastern part of the State. It has maximum security facilities in which certain classifications of inmates are confined, including two facilities referred to in the record as Cellhouse 19 and Cellhouse 20.

If an inmate of the Penitentiary behaves himself and presents no problems, he resides in the general prison population. In that status he is required to observe prison rules and regulations and to perform certain work. However, he is entitled to certain privileges and opportunities and he receives some monetary compensation for the work that he performs.

On the other hand, an inmate who violates prison rules or who is a security risk may find himself removed from general population and placed in administrative segregation or some other type of solitary confinement. In his findings in this case the district judge defined administrative segregation as follows:

> During the pertinent period, the term 'administrative segregation' meant confinement to an individual cell 24 hours a day, except for showers and visitation. Prisoners in administrative segregation were not permitted to work and visitation periods and canteen access were restricted. The administrative segregation cells were similar to those of cells in the gen-

---

**2.** Our opinion in this case should perhaps be read in connection with the opinions of Judge Hanson and of this court in a case involving two Penitentiary inmates, Warner S. Kelly and Samuel S. Parras, who were confined in administrative segregation at about the same time as that at which plaintiff in the instant case was so confined, with Kelly being confined for a time in a strip cell similar to one in which plaintiff was confined. Judge Hanson concluded in that case that plaintiffs were entitled to equitable relief. Both sides appealed, and this court affirmed the decision of the district court in part and reversed it in part considering that the relief granted had been to some extent overbroad. *Kelly v. Brewer,* 378 F.Supp. 447 (S.D.Iowa 1974), *aff'd in part and reversed in part,* 525 F.2d 394 (8th Cir. 1975). We observe in passing that Kelly and Parras were represented in the district court by certain Iowa Law

College personnel who are mentioned as having at one time or another represented plaintiff in this case, and that the complaint in this case was signed by the same attorney who represented Kelly and Parras in connection with the appeals that were taken to this court in their case.

**3.** Prisons change with the passing of time and with recognition of new concepts of how convicts should be treated and of what their constitutional rights are. In recent years such recognition has frequently been brought about as a result of the intervention of federal courts in § 1983 suits brought by convicts. The record in this case was made up in 1975 and 1976, and the case was decided by the district court in early 1977.

eral population; that is, personal possessions were allowed and prisoners received library privileges and regular meals. Finally, inmates in administrative segregation received $6.50 per month 'idle pay.'[4]

In 1973 and 1974 an inmate confined in administrative segregation was not as well off as an inmate in general population, but his situation was infinitely to be preferred to that of an inmate whose conduct caused him to be confined in a strip cell. In such a cell the inmate was confined completely nude; the cell was or could be darkened; the inmate had no bedding or cover. While the cell contained a sink and a commode, in some circumstances the inmate was not provided with toilet articles or toilet paper. He did receive three meals a day and could help himself to water from the sink in the cell. An extremely recalcitrant convict might be confined in such a cell and under such conditions for a prolonged or substantial period of time.[5]

During the relevant period Iowa prison authorities seem to have recognized at least in a general way that convicts are entitled to communicate with the courts and with attorneys. That recognition, however, was characterized by substantial restrictions on the exercise of the right just mentioned.

Prior to July, 1974 inmates were not permitted to send sealed letters addressed to anyone, including judges and lawyers, outside the prison. Outgoing letters had to be submitted unsealed and were subject to inspection and reading by prison personnel. In July, 1974, following the opinion of the Supreme Court in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the rule was changed to the extent that inmates were permitted to correspond with courts and counsel without interference or inspection by prison staff.

As to incoming mail, if a letter to an inmate from a lawyer or a judge was not marked "attorney-client" or "court-client," it would be opened in the absence of the addressee, checked for contraband and read. If a letter was marked as indicated, it would be opened by prison personnel only in the presence of the addressee and checked for contraband; presumably, it would not be read.

There was also a restriction on the ability of an inmate to confer with an attorney by telephone. If an inmate desired to make a call to his attorney, he first had to obtain the permission of his "counselor," and if permission was granted the duration of the call might be limited by prison authorities to what they considered to be a reasonable length of time.

## II.

Plaintiff's complaint contained three counts.

In the first count plaintiff complained that on July 2, 1973 he was removed summarily from general population and placed in administrative segregation in Cellhouse 19 without any prior or subsequent hearing with respect to the episode of July 2 that caused him to be placed in segregation, and that thereafter misconduct reports against him were filed with respect to which he received no hearings.

Plaintiff alleged that the denials of hearings deprived him of procedural due process of law. He prayed for an injunction against being placed again in administrative segregation without an appropriate hearing, and he also prayed that the defendants be enjoined from using the mis-

4. A somewhat more detailed description of administrative segregation will be found in the opinion of the district court in *Kelly, supra*, 378 F.Supp. at 450–51.

5. The difference between confinement in a strip cell and confinement in ordinary administrative segregation was pointed up by the district court in its opinion in the *Kelly* case *supra*. Attention should be called to the fact that the rigor of confinement in a strip cell was not particularly related to the cell itself but to the conditions of the confinement therein which could be changed for better or for worse by prison personnel. Today, confinement of a prison inmate in a cell under conditions described in the text would unquestionably be held unconstitutional, and Judge Hanson recognized the unconstitutionality of such confinement in his opinion in *Kelly, supra*, 378 F.Supp. at 453.

conduct reports for any purpose and from placing them in plaintiff's parole file. Plaintiff also asked that he be awarded "back pay," apparently measured by the difference between the "idle time" for which he was paid and what he would have earned had he been in general population.

Count II relates to the period of time between October 22 and December 7, 1973 during which plaintiff was confined in a strip cell in Cellhouse 20. He alleges that the conditions of confinement there amounted to a constitutionally prohibited cruel and unusual punishment, and he also alleges that during this period of time he was unconstitutionally denied the means of communicating with counsel or with the courts.

Plaintiff sought injunctive relief, actual damages in the sum of $2700.00 and punitive damages in the sum of $5,000.00.

In Count III plaintiff complained of official interferences with his correspondence with counsel and with the courts and with the interruption of a particular telephone call with an attorney. He sought injunctive relief, actual damages amounting to $12,700.00 and punitive damages in the sum of $25,000.00.

### III.

As has been said, the district court made detailed findings of fact in the case, which findings are supported by substantial evidence and are not clearly erroneous. Indeed, there is little dispute about the facts themselves.

From the record as a whole it is clear that plaintiff is a sociopathic criminal who is violent and dangerous and who is a strong man physically. Prior to July 2, 1973 he was confined in the Penitentiary as a member of general population. However, on that date he ran amuck, engaged in assaultive conduct and destroyed or damaged state property. When finally subdued, plaintiff was summarily placed in administrative segregation pending further investigation of his conduct, including a determination by the County Attorney of Lee County as to whether plaintiff should be charged with substantive offenses under the criminal laws of Iowa. Plaintiff was never given an administrative hearing with respect to the episode that led up to his initial confinement in administrative segregation in Cellhouse 19.[6]

Held in administrative segregation under the conditions that have been described, plaintiff began in August, 1973 to "act out" his frustrations and hostilities. Judge Hanson described plaintiff's conduct as follows:

After July 2, while confined in administrative segregation, plaintiff Wycoff often displayed animal-like behavior. He threatened guards, screamed obscenities, destroyed considerable property, and threw urine and fecal matter on guards passing by his cell. Prison officials responded with further misconduct reports, which were issued on the ensuing dates: August 7, 11, 14, 24, 28 and 30 of 1973; September 29, 1973; and October 6 and 8 of 1973.

Disciplinary hearings were conducted with respect to the episodes of August 14 and 24. In both instances plaintiff admitted his guilt and was sentenced to continued confinement in administrative segregation.

On October 22, 1973 plaintiff destroyed his entire cell in Cellhouse 19 and was moved to a strip cell in Cellhouse 20. We have already described the conditions of

---

**6.** When an inmate of a state penal institution commits an act or series of acts which arguably may constitute not only a breach of prison discipline but also a violation of substantive state law, a question of policy may present itself to the prison officials. The question is whether prison disciplinary procedures should be followed or whether the matter should be left to the local civilian prosecutive officials. The converse of that question presents itself to the local prosecutor who must decide whether to file a criminal charge against a man already in prison or whether to let the man be subjected simply to prison discipline. Resolving such questions involves a degree of communication between prison officials and state prosecutors. The County Attorney of Lee County finally decided not to prosecute plaintiff but may have failed to communicate his decision to prison authorities.

confinement in such a cell, and the description need not be repeated.

On October 30, 1973 plaintiff engaged in another episode of violent "acting out," and he was able to wreck the cell in which he was confined with the destruction including the tearing of the plumbing fixtures from the walls.

Plaintiff apparently remained in what was left of that cell until prison personnel could build a special cell for his confinement, and when that was done plaintiff was moved into it. In that cell, which was designated as B–5, the sink and toilet were imbedded in concrete. A concrete slab covered with a foam rubber mattress served as a bed. When plaintiff was moved to Cell B–5, he stated, "You build 'em—I'll tear 'em up."

During his stay in Cellhouse 20 plaintiff repeatedly requested an interview with Warden Brewer to discuss the conditions of plaintiff's confinement, but the Warden refused to grant such an interview. By November 26, 1973 the prison's Adjustment Review Committee offered plaintiff some clothing, but he was unwilling to accept it unless the Warden consented to an interview which the Warden was unwilling to do.

Despite the rigors of his confinement, plaintiff had been able by November 29, 1973 to get in touch with counsel, and a suit was filed in his behalf in the district court; the complaint prayed for a temporary restraining order in connection with the condition of plaintiff's confinement.

The commencement of that action brought about a conference between plaintiff's attorneys, a representative of the Attorney General of Iowa, the prison ombudsman, and a deputy warden of the Penitentiary. In the course of that conference it was agreed that plaintiff would be allowed clothing, articles of personal hygiene, toilet paper and writing materials whereby he might communicate with his attorneys.

That conference was held in early December, 1973 and between December 7 and 12 of that year plaintiff was issued most of the basic necessities and amenities for suitable prison living. Beginning with that development and continuing into 1974 both the conditions of plaintiff's confinement and his own behavior improved, and on August 12, 1974 plaintiff was returned to general population.

With respect to plaintiff's claims that prison authorities interfered with his correspondence with counsel and with the courts, the district court found that on three occasions prison personnel opened letters addressed to plaintiff and plainly marked either "attorney-client" or "court-client." One of those letters was from a law student intern, Kevin Kennedy, and the other two were from the district court. The district court also found that in early 1974 prison personnel opened letters from plaintiff marked "attorney-client," one of which letters was addressed to Judge Hanson. And it was further found that after the rule change in July, 1974 the prison staff refused to mail a letter properly marked from plaintiff to one of his attorneys, David Clark.

In January, 1974 plaintiff obtained permission to make a telephone call to Robert Bartels, Esq. of the College of Law, University of Iowa. The call was made and the conversation continued for fifteen or twenty minutes and was then terminated by prison personnel because it was felt that the conversation had gone on long enough.

On the basis of the facts as found by the district court and as stated here, the district court concluded with respect to Counts I and II of the complaint that plaintiff had brought all of his troubles on himself by his own violent misconduct and for that reason was not in any position to complain of any violations of constitutional rights. As to Count III the trial court concluded that while some of the interceptions of plaintiff's correspondence were unjustified, he had sustained no damage as a result of the interceptions, and it was the opinion of the district court that the termination of the telephone conversation between plaintiff and Mr. Bartels was reasonable.

## IV.

We have considered the record in this case in the light of what have become es-

tablished principles of constitutional law in the fields of convict rights and convict treatment. And, we have noted in the margin a parallel between this case and the case of *Kelly v. Brewer*, 378 F.Supp. 447 (S.D.Iowa 1974), *aff'd in part and reversed in part*, 525 F.2d 394 (8th Cir. 1975).[7]

It is clear to us that the prison officials were justified in placing plaintiff in administrative segregation following his violent conduct of July 2, 1973 and in keeping him in a segregated status thereafter on account of his continued "acting out." While we think that plaintiff should have been given a hearing soon after his initial confinement in segregation, it appears that the failure of prison personnel to provide such a hearing is explainable in part by the fact that the County Attorney was considering whether to file criminal charges against plaintiff.[8] We condemn without reservation plaintiff's confinement in strip cells under the conditions that have been mentioned. Those conditions were referred to by Judge Hanson in his opinion in the *Kelly* case as being "subhuman and subanimal." 378 F.Supp. at 453. Moreover, under the holding in *Procunier v. Martinez, supra*, the interferences with plaintiff's correspondence with his lawyers and with the district court violated his constitutional rights.

However, as we indicated at the outset of this opinion, plaintiff's claims for injunctive relief have become moot, if, indeed, he stood in need of such relief as late as 1977, and we are satisfied that this is not an appropriate case for any award of damages against Warden Brewer or his superiors.

■ While the interferences with the correspondence of plaintiff were unconstitutional and unjustified, we agree with the district court that they did not inflict on plaintiff any damages with respect to which he would be entitled to monetary compensation. And we agree with the district court that the termination of plaintiff's telephone conversation with Mr. Bartels was a reasonable and justified action.

The question of whether plaintiff should have an award of damages on the basis of the deprivations alleged in Counts I and II of the complaint is somewhat more difficult, and this is particularly true with respect to Count II which relates to the confinement of plaintiff in strip cells. We think, however, that the question must be resolved against the plaintiff.

■ We recognize, of course, that state officers and employees may in proper circumstances be held personally liable in damages for deprivations of federally protected rights, and that this potential liability extends to prison officials and employees, including high ranking officials in a state penal system. *See* the very recent case of *Procunier v. Navarette*, —— U.S. ——, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), and cases cited.

However, it is one thing to grant to prison inmates, including violent or recalcitrant ones, prospective declaratory or injunctive relief designed to protect them in the future from unconstitutional practices or conditions. It is quite another thing to expose prison personnel, including personnel in the higher echelons of prison administration and policy formulation, to personal pecuniary liability in suits brought by largely irresponsible inmates under § 1983. Such suits are frequently without merit and may be maliciously motivated. An inmate may use a suit or a threat of a suit as a lever to obtain favorable treatment or a desirable work assignment. Since § 1983 suits are usually prosecuted in forma pauperis, and since prison officials may not constitutional-

---

**7.** The parallel between this case and *Kelly* is only partial. Unlike the plaintiff in this case, Kelly and his co-plaintiff, Parras, did not conduct themselves while in administrative segregation in a manner comparable to the behavior of plaintiff here. Kelly's initial confinement for a short time in a strip cell after he had killed a prison guard was largely punitive and probably vindictive. Neither Kelly nor Parras sought pecuniary damages. In view of those distinc-

tions the action taken by the district court in this case was not necessarily inconsistent with the action that it took in *Kelly* or with the holding of this court in that case.

**8.** A state criminal charge was in fact filed when plaintiff destroyed his cell in Cellhouse 19. Plaintiff pleaded guilty to the charge and received a consecutive but suspended sentence.

ly retaliate against a convict for invoking his right of access to the courts, inmates have essentially nothing to lose, including time, by prosecuting such actions, and they may gain something even if it is nothing but the satisfaction of harassing, inconveniencing and annoying those who have them in charge.

From our statement of the facts in this case it is obvious that plaintiff would never have been placed in administrative segregation had he not conducted himself as he did on July 2, 1973; and his continued confinement in that status was due at least in large measure to his deliberate and continued violent acts while in Cellhouse 19, which acts were directed specifically at custodial personnel and at state property. If plaintiff had not destroyed his cell in Cellhouse 19, he would not have been put in a strip cell in Cellhouse 20, and if he had not destroyed the first strip cell in which he was placed, he would not have been placed in the second which had to be built for him personally.

In view of that conduct on plaintiff's part, the propriety of an award of damages to him on account of the length and conditions of his confinement in administrative segregation, including the confinement in the strip cells, would seem questionable at best. It must be realized, however, that prison administrators are required to deal in a constitutional manner with convicts who are violent and unruly as well as with those whose conduct is exemplary or at least peaceful. And while prison officials must have some latitude in imposing conditions reasonably necessary to control a prisoner's behavior, the contributory fault of an inmate does not necessarily deprive him of his right to relief from deprivations of constitutional dimension.

We think, however, that the defendants in this case are shielded from liability for damages by the qualified executive privilege recognized in *Procunier v. Navarette, supra. See also Cox v. Cook*, 420 U.S. 734, 95 S.Ct. 1237, 43 L.Ed.2d 587 (1975); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Ervin v. Ciccone*, 557 F.2d 1260 (8th Cir. 1977).

There is nothing here to indicate that any of the defendants acted toward plaintiff in bad faith or with personal malice. Warden Brewer simply applied or caused to be applied to plaintiff custodial procedures which he believed at the time to be proper and permissible and to be necessary in the case of plaintiff. The incorrectness of his ideas was not as clearly established in 1973 and 1974 as it is today. *Procunier v. Navarette, Cox v. Cook*, and *Ervin v. Ciccone, supra.* The district court did not hand down its decision in *Kelly* until June, 1974 by which time the conditions of plaintiff's confinement had been much alleviated; this court did not decide *Finney v. Arkansas Board of Correction*, 505 F.2d 194 (8th Cir. 1974), until October 10, 1974, by which time plaintiff was back in general population; and we did not decide *Kelly* until November, 1975.

In view of what has been said, the judgment of the district court will be affirmed. Had the case arisen substantially later than it did, a different result as to damages might well have been indicated.

Affirmed.