**James Byron GREEN, Plaintiff,**

v.

**Margaret BARON, Joan C. Wright, Sherri Shea, Gary Kirchhof, and Romulo Lara, Defendants.**

**Civ. No. 80–313–E.**

United States District Court, S.D. Iowa, C.D.

June 15, 1987.

---

Steven DeVolder, Jeffrey Lewis, Des Moines, Iowa, for plaintiff.

John Parmeter, Sarah Coats, Asst. Attys. Gen., Des Moines, Iowa, for defendants.

## ORDER

DONALD E. O'BRIEN, Chief Judge.

The Court has before it plaintiff's motion for a judgment n.o.v. and a motion, in the alternative, for a new trial on his constitutional claims. A hearing was held before the Court on March 9, 1987, and briefs and supplementary letters have been submitted on behalf of each party. For the reasons below, the Court grants plaintiff's motion for judgment n.o.v., grants in part and denies in part plaintiff's motion in the alternative for a new trial, and finds that the defendants are entitled to a jury trial on the question of damages.

## UNCONTESTED FACTS

In November 1979, James Byron Green was arrested for attacking his mother with his fists and the butt of a shotgun. Mr. Green stated that he believed his parents were hired by the Russians or the Mafia to blow up the local John Deere factory. Following his arrest, Mr. Green was hospitalized in the Mental Health Institute in Independence, Iowa for over one month. Following an escape, he was confined at the Iowa Men's Reformatory. A psychiatrist at the reformatory concluded that Green was in need of "immediate hospitalization and treatment," and on January 18, 1980 a state district court judge ordered Green transferred to the Iowa Security Medical Facility in Oakdale, Iowa "for examination and treatment deemed necessary by staff physicians." (Exhibit A). Upon his arrival at ISMF on January 24, Mr. Green was diagnosed as suffering from an antisocial personality and paranoid schizophrenia. (Exhibit H at 5).

A "treatment team" for Mr. Green which included Defendants Lara, Shea, Kirchhof and Baron was created upon his arrival at Oakdale. Dr. Lara testified that treatment team members put their heads together to determine a course of treatment for a given patient. Dr. Lara was Mr. Green's treating psychiatrist, Mr. Kirchhof was a supervisory nurse, Ms. Shea was a registered nurse, and Ms. Baron was a correctional officer. Defendant Joan Wright joined the plaintiff's treatment team in March 1980 following an intrafacility transfer.

The facility's progress notes on Mr. Green indicated that he was often rude and disrespectful during his first weeks at Oakdale. In response to his indecent language, the treatment team ordered personnel to tape his mouth shut for one-half hour following "inappropriate verbal remarks." (Exhibit H at 8). Whenever he belched or passed gas, he was required to wear a sign stating "sometimes I'm rude and crude." (Exhibit H at 8). Whenever he was caught staring at someone, he was required to stand in a corner facing the wall for one-half hour. (Exhibit H at 11). Whenever he was caught lying about his actions, he was required to wear a sign stating "you can't always believe what I say." (Exhibit H at 23). On February 3, he was placed on a social isolation program, where he was forced to sit on a bench at a nurses' station during his spare time until his behavior improved.

On February 25, the treatment team agreed to place Mr. Green on a "special treatment program" by confining him to a barren room on the facility's "B unit." The purposes and conditions of this decision are reflected in the memo notifying ISMF Superintendent Paul Loeffelholz of the decision:

Mr. James Green is a 20–year-old single man from Waterloo, Iowa who was admitted to this hospital on January 24, 1980. He is charged for terrorism, having severely assaulted his mother with a shotgun. He has had several MHI Independence admissions, initially diagnosed as an Adolescent Adjustment Reaction, later seen as Paranoid Schizophenic.

Ever since admission, Mr. Green has constantly tested limits, been uncaring of expectations, and has alienated his peers. He would belch and pass gas in public, neglect his hygiene if allowed, be profane,—in short, he would almost defy both staff and patients. Not only would he not accept, but argue against constructive criticism. In interviewing his parents, both are now of the mind that their son should be in prison, if only to

preserve their wellbeing. They describe their son as completely ungovernable, into illicit drugs, and later on, suffering from some psychosis.

All efforts to catch Mr. Green's attention or commitment have so far failed, including social isolation.

We therefore propose that he be placed on a special treatment program whereby he earn himself out of the B unit in two weeks. This goes as follows: On his first 24 hours, he is granted nothing. On day 1 he gets his blanket at night; on day 2, he earns his mattress at night; on day 3 he earns the privilege to work; day 4 he earns his breakfast; on day 5 he earns the privilege of attending 9 a.m. class; on day 6 he earns the privilege of attending group, but if that is not a group day, he can earn an hour's free time; on day 7 he earns lunch; on day 8 he earns 1 p.m. class; on day 9 he earns supper, on day 10, he earns an hour of free time; on day 11 he earns evening class, but in the absence of that, he is given one-half hour on the unit; on day 12 he is allowed to earn commisary; on day 13, he is finally liberated. Any violations would set him back one day.

(Exhibit P).

Defendants' counsel conceded in his opening argument that the only clothing Mr. Green was permitted to wear in the cell was his undershorts. The cell was furnished with a combined sink and commode, but Mr. Green was not provided with toilet paper. Witnesses disputed the temperature of the cell, but progress notes state that Mr. Green was given a blanket for six hours on the morning of March 1 before he had earned it "due to the extreme cold weather." (Exhibit H at 55). If a meal was not yet earned, the plaintiff would be given a sack lunch in his cell instead of an opportunity to eat with others.

With the exception noted above, the plaintiff was deprived of all bedding for a period of six days and five nights between February 25 and March 1. On the evening of March 1, he "earned" a blanket, but that blanket was taken the next morning and was not returned until the evening of March 4, when he was given a blanket and a mattress. (Exhibit H at 60). In the meantime, he had no choice but to sleep directly on the tile floor of his cell. It appears that even after he earned his bedding, it would be taken from him at sunrise and not be returned until bedtime. Mr. Green slowly progressed to the final levels of the program, and on March 24 was released. On March 28 he was again placed on a special treatment program in the same "B unit" after he struck an officer and created a disruption. He was deprived of all bedding for a period of two days and two nights, and a mattress for a period of three days and three nights, with daytime deprivations thereafter. (Exhibit H at 99). He was released from the program on April 23.

The plaintiff was discharged from ISMF to the custody of county officials on June 6, 1980. Mr. Green had not yet been tried. When tried, he was found not guilty by reason of insanity. While at ISMF, Mr. Green was never given a hearing or any other proceeding at which his guilt or responsibility for violating rules or expectations could have been adjudicated. The sole adjudicatory proceeding between his arrest and his trial was the state commitment proceeding.

The plaintiff also claims that the defendants were negligent and deliberately indifferent to serious medical needs created by their injections of prolixin, an antipsychotic drug which he was given from March 26 until his discharge. He testified that he immediately began to suffer side effects such as nausea, diarrhea, "rachetting," dizziness, nervousness, and insomnia, but that his complaints were ignored until April 15, when he was given cogentin, which ameliorates the negative side effects of prolixin, after asking for the drug by name. The progress notes of April 15 state that Mr. Green was given cogentin after he exhibited signs of pseudo-Parkinsonism. (Exhibit H at 119). In an August 1980 memo defending Mr. Green's treatment, Dr. Lara wrote that vomiting, diarrhea and nervousness "do not represent the side effects of prolixin; quite the contrary, these are attributable to his emotional turmoil." He

also wrote that "the injudicious use of cogentin may usher toxin brain syndrome and diminishes his intestinal absorption of antipschotic medications and thereby partially interferes with antipsychotic effectiveness." (Exhibit 6). Dr. Loeffelholz testified that cogentin was not given earlier because the signs of pseudo-Parkinsonism were "soft", and because 80% of persons on psychiatric medications complain of restlessness and nervousness. The plaintiff's expert testified that the side effects of prolixin are well known to employees and patients in such facilities, and that much of Mr. Green's agitation could be traced to the use of prolixin without cogentin.

In its final form, the plaintiff's complaint stated three constitutional claims and three state law claims. The first constitutional claim alleged that all defendants were deliberately indifferent to serious medical needs; the second alleged that he was deprived of basic necessities; the third alleged that he was punished prior to an adjudication of guilt. His state law claims alleged that all defendants were negligent and that the professional defendants committed malpractice. Allegations that each defendant acted willfully and wantonly were added to the state law claims in order to qualify for an exception to the Iowa Tort Claims Act, Iowa Code § 25A.2(5)(b) (1979).

Following a one-week trial, a jury reached a verdict in favor of all remaining defendants on all claims, and post-trial motions followed. The plaintiff seeks a judgment n.o.v. on his claim that he was unconstitutionally deprived of basic necessities, and in the alternative, a new trial on each of his constitutional claims.

## JUDGMENT N.O.V.

### I

■ The plaintiff argues that the Court improperly curtailed a clearly established right not to be deprived of basic necessities by instructing the jury of an exception to the right which was not supported by precedent.[1] After a careful review of the relevant case law from the Supreme Court, the Eighth Circuit, and this court, the Court finds that the plaintiff is correct, and that the jury verdict on his basic necessities claim therefore cannot stand.

A prisoner's [2] right not to be deprived of the "basic necessities of human existence" or subjected to "subhuman or subanimal" conditions has been clearly established in this district and this circuit since 1974. In *Kelly v. Brewer*, 378 F.Supp. 447 (S.D.Iowa 1974), the plaintiff was placed in a dark isolation cell after murdering a prison guard. For four days, he was denied clothing, bedding, toilet paper, and showers, and was given no eating utensils and irregular meals. *Id.* at 449. Judge William Hanson of this court held that such conditions "offend societal standards of decency and respect for human life and thus constituted cruel and unusual punishment." *Id.* at 453.[3] The defendant apparently chose not

---

1. The critical part of Instruction 13 on basic necessities states:

    If you find that the defendants denied plaintiff basic necessities, then you must find for the plaintiff, unless you find that the defendants denied plaintiff basic necessities and that this was done to preserve the security or safety of the plaintiff, Oakdale, or other inmates, and this could not have been accomplished by alternative or less harsh means. If you so find, you should find for the defendants.

2. The defendants have objected to the use of cases involving the Eighth Amendment, saying it only protects convicted prisoners and that Mr. Green was never convicted. Although the plaintiff was a pretrial detainee while at Oakdale, the Supreme Court held in *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979), that the rights of pretrial detainees are at least as strong as the rights of convicted prisoners. Thus, the plaintiff undoubtedly has a right not to be subjected to conditions which would constitute cruel and unusual punishment if inflicted upon a convicted prisoner.

3. In a recent case involving two deprivations of clothing and bedding which lasted for no more than eighteen hours, an Eighth Circuit panel suggested that the duration of these deprivations may have been too short to constitute a constitutional violation, depending upon whether other circumstances were present. *Johnson v. Williams*, 788 F.2d 1319, 1323 (8th Cir.1986). The defendants have not argued that the deprivations of clothing and bedding in this case were too brief to deserve constitutional scrutiny, and the Court notes that the plaintiff was denied adequate clothing and bedding for a longer period than the plaintiff in *Kelly*.

to appeal this particular finding. *See Kelly v. Brewer*, 525 F.2d 394 (8th Cir.1975) (modifying other portions of the district court's order).

In October 1974, the Eighth Circuit recognized the same right. Reviewing a nutritionally suspect diet in a prison's punitive wing, the court held that "there exists a fundamental difference between depriving a prisoner of privileges he may enjoy and depriving him of the basic necessities of human existence." *Finney v. Arkansas Board of Corrections*, 505 F.2d 194, 207 (8th Cir.1978). Quoting from a Virginia decision involving a bread-and-water diet, the Eighth Circuit noted that "as a technique designed to break a man's spirit not just by the denial of physical comforts but of necessities, to the end that his powers of resistance diminish, the bread and water diet is inconsistent with current minimum standards of respect for human dignity." *Id.* at 207 n. 9. The district court was ordered to "ensure that prisoners placed in punitive solitary confinement are not deprived of basic necessities including light, heat, ventilation, sanitation, clothing and a proper diet." *Id.* at 208.

Any belief that these decisions only prohibited a purely retributive use of such conditions should have been dispelled in *Wycoff v. Brewer*, 572 F.2d 1260 (8th Cir. 1978). In *Wycoff*, the Eighth Circuit was presented with a perfect case for recognizing a "security or safety" exception to the basic necessities requirement, and chose not to do so. Mr. Wycoff was described by the Circuit as a "sociopathic criminal who is violent and dangerous and who is a strong man physically." *Id.* at 1264. Prior to and during his confinement in a series of strip cells without bedding or cover, he displayed "animal-like behavior", engaging in assaultive conduct, threatening guards, and destroying much property. As the Eighth Circuit would later say of the *Wycoff* case, "clearly his confinement under these rigorous conditions was for practical and not punitive or vindictive reasons." *Maxwell v. Mason*, 668 F.2d 361, 364 (8th Cir.1981). Nevertheless, the *Wycoff* court "condemn[ed] without reservation plaintiff's confinement in strip cells under the conditions that have been mentioned." *Id.* at 1266. Although the court found the defendants were entitled to good-faith immunity because his confinement preceded *Kelly* and *Finney*, the court noted that "had the case arisen substantially later than it did, a different result might well have been indicated." *Id.* at 1267.[4]

The case upon which the defendants rely most heavily in seeking security and treatment exceptions to this rule was decided the following year. In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court reviewed the constitutionality of double-bunking, visual body cavity searches, room searches, and incoming mail restrictions at a pretrial detention center. The court held that "a court must decide whether [a particular restriction or condition accompanying pretrial detention] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.... Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not without more amount to 'punishment.'" 441 U.S. at 538–9, 99 S.Ct. at 1873–4. Because preserving security was recognized in *Bell* as a legitimate governmental objective, the defendants argue that the jury was properly permitted under Instruction 13 to find for the defendants, even if the plaintiff was deprived of his basic necessities, if that deprivation was the least harsh means of

---

4. The defendants have attempted to distinguish *Wycoff* by characterizing it as a case involving "a challenge to moving the plaintiff from punitive administrative segregation to strip cell status without providing procedural safeguards." Describing *Wycoff* as a case about procedural due process is like describing *The Wizard of Oz* as a movie about Kansas. The description is technically accurate, but is completely misleading. Any reasonable public official would read the *Wycoff* decision as a condemnation of the

preserving the security or safety of the plaintiff, Oakdale or other inmates.[5]

Although the Court used this interpretation of *Bell* when adding the exception to Instruction 13,[6] it now concludes that this was an error. A key premise of the defendants' theory is that the *Bell* decision not only redefined the term "punishment" as it is used in the ban on pretrial punishment, but also redefined in for purposes of the ban on cruel and unusual punishment. If so, the Eighth Amendment's previously unconditional prohibitions against certain tactics should now be permissible if the objective is legitimate and the means is arguably[7] related to it. It would follow from this theory that the prohibition of deliberate indifference to prisoner's serious medical needs could be overcome if prison officials can articulate some legitimate objective to which it is arguably related. The same caveat would apply to the ban on whipping prisoners in *Jackson v. Bishop*, 404 F.2d 571 (8th Cir.1968). The Court is not prepared to tear down the principled case law which higher courts have erected to protect "the dignity of man," *id.* at 579,

in order to replace it with an unprincipled approach in which a legitimate end will justify an otherwise cruel means. That kind of reasoning may have been appropriate for reviewing the double-bunking, strip searches and room searches involved in *Bell*, but it is most inappropriate to review the more fundamental rights which are protected under the ban on cruel and unusual punishment. *Hamm v. DeKalb County*, 774 F.2d 1567, 1573–4 (11th Cir.1985).

## II

Even if a *Bell* exception to the rule against deprivations of basic necessities should exist, Instruction 13 was not faithful to *Bell*'s most important principles. The *Bell* court reiterated the well-established rule that pretrial detainees may not be punished prior to an adjudication of guilt, and held, *inter alia*, that conditions *intended* to punish may not be imposed upon pretrial detainees *no matter how related that punishment may be to legitimate governmental objectives.* 441 U.S. at 535, 538, 99 S.Ct. at 1872, 1873.[8] By

---

procedural *and substantive* impropriety of his confinement.

**5.** The defendants also cite a settlement agreement in *Gavin v. Ray*, No. 78–62–2 (S.D.Iowa), and a consent order in *Zambrano v. Brewer*, No. 73–296–2 (S.D.Iowa), which did not completely prohibit the use of strip cells at the Iowa State Penitentiary. They rely upon these agreements as judicial authority, contending that no judge would have approved them if he believed they permitted unconstitutional practices to occur. The defendants exaggerate the power of a judge to control class action settlements. As the Supreme Court recently noted, "Rule 23(c) does not give the court the power, in advance of trial, to modify a proposed consent decree and order its acceptance over either party's objection." *Evans v. Jeff D.,* —— U.S. ——, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986). While a judge's signature should indicate that he believes the settlement was fair and reasonable as a whole, *see Watson v. Ray*, 90 F.R.D. 143, 146 (S.D.Iowa 1981), it cannot indicate that a judge was satisfied that the Constitution could not require more from the defendants. Such settlements usually occur because defendants and plaintiffs prefer a formal commitment to respect certain rights and privileges which is enforceable through contempt proceedings, rather than a judicial ruling on the legal merits of the class's entire claim. For this reason, settlement agreements seldom

track the law, and cannot be considered as an accurate reflection of the law's reach.

**6.** The Court added an exception to Instruction 13 for purely procedural reasons, once it became clear that an instruction most faithful to *Wycoff* and other basic necessities cases would effectively direct a verdict against the defendants. Sometimes the law requires a directed verdict. However, a directed verdict is the least favored form of judicial control, in part because an improperly entered or instructed directed verdict cannot be remedied without a second full trial. *Hladyshewski v. Robinson*, 557 F.2d 1251 (8th Cir.1977). For this reason, the Court preferred to err against the plaintiff, and to resolve the question on post-trial motions if a verdict against the plaintiff was returned.

**7.** In theory, the *Bell* standard requires a reasonable relationship between ends and means, but courts have read the requirement of judicial deference to prison decisions on the reasonableness question so as to permit means which only arguably advance legitimate ends. *See Goff v. Nix*, 803 F.2d 358 (8th Cir.1986). Because this part of the *Bell* standard can be satisfied so easily, it is difficult to believe that the standard was intended to govern more fundamental rights.

**8.** The *Bell* decision also reaffirmed the Supreme Court's holding in *Ingraham v. Wright*, 430 U.S.

contrast, Instruction 13 conclusively presumed that if a deprivation of basic necessities was the least restrictive means toward preserving security, it was not intentional punishment in the improper sense.

This conclusive presumption was legally and logically incorrect because it rested upon a false dichotomy between an intent to preserve security and an intent to punish. In other words, the fact that the defendants may have intended to preserve security does not mean that they did not also intend to punish. Conditions of confinement are often motivated by an intent to punish and an intent to preserve security, because in its most rational form, punishment is a form of preserving security through special deterrence. The Supreme Court recognized in *Bell* that an intent to deter is a punitive intent, noting that deterrence is not a legitimate nonpunitive governmental objective. *Bell*, 441 U.S. at 539 n. 20, 99 S.Ct. at 1874 n. 20. Because deterrence is a traditional aim of punishment, *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168, 83 S.Ct. 554, 567, 9 L.Ed.2d 644 (1963), the *Bell* decision cannot excuse the conditions of Mr. Green's confinement prior to any adjudication of guilt if those conditions were intended to deter him from repeating his previous behavior, even if the ultimate goal was to make Mr. Green less of a threat.

There is nothing in *Bell* or in any other cases cited by the defendants which suggests that the only type of intentional pretrial punishment which the Supreme Court sought to prohibit was retributive punishment or irrational punishment. This Court is not persuaded that such a distinction should be a part of the law. The Court is aware of the social benefit which can result if ISMF officials can change disrespectful and dangerous suspects into submissive and obedient citizens. However, the constitutional principle that punishment should only follow an adjudication of guilt is logically irreconcilable with the theory that punishment may be used when it is in socie-

ty's interest. H.L.A. Hart, *Punishment and Responsibility*, 81-2 (1968). *See also* Kadish, *The Decline of Innocence*, 26 Cambridge L.J. 273, 278 (1968). Prohibiting both sophisticated and simple-minded attempts to punish without an adjudication of guilt is necessary to preserve the integrity of the criminal justice system. If state officials, acting on no more authority than an involuntary commitment order, can create prison-like conditions as part of a separate system of behavior modification, in order to achieve the most important goals of the corrections system but without the procedural and substantive safeguards which can only come with an adjudication of guilt, they will have effectively circumvented the heart of the criminal justice system. "We would then sacrifice the principle of fairness designed to protect the individual from society to the principle that an overwhelming advantage to society should be secured at any cost." Hart, *supra* at 81.

### III

■ For similar reasons, the Court could not have used the instruction the defendants preferred, which would have told the jury that psychiatric treatment is a legitimate governmental objective and that a deprivation of basic necessities which is reasonably related to that goal is permissible. The Supreme Court has recognized an unconditional right of involuntarily committed mental patients not to be deprived of basic necessities. In *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the court reviewed the constitutionality of certain practices at a state hospital in Pennsylvania. Pennsylvania conceded and the court agreed that the hospital could never deprive patients of adequate food, shelter, clothing and medical care, and the Court suggested no exceptions. 457 U.S. at 315, 324, 102 S.Ct. at 2457-8, 2462.

---

651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), that there is a "de minimis level of imposition [of punishment] with which the Constitution is not concerned." *Bell*, 441 U.S. at 539, 99 S.Ct. at

1874, *quoting Ingraham*, 430 U.S. at 674, 97 S.Ct. at 1414. To their credit, the defendants have not attempted to characterize Mr. Green's treatment on the B unit as a de minimis imposition.

In his closing argument, defendants' counsel stated that "I think the crux of this case is really this question—were the things that happened to Mr. Green at the Oakdale facility—were they punishment or were they treatment? It's our position that they were treatment." However, the dichotomy between an intent to punish and an intent to treat is equally false. When a mental patient is intentionally subjected to harsh conditions in order to deter him from maintaining a course of conduct, the fact that it is done in the name of psychiatric treatment does not keep it from being intentional punishment. Long before Mr. Green was placed on the B unit, officials as ISMF were informed in no uncertain terms by the Eighth Circuit that a practice which is treatment to them can be cruel and unusual punishment under the Constitution. In *Knecht v. Gillman,* 488 F.2d 1136 (8th Cir.1973), the court reviewed the practice at ISMF of injecting patients with the drug apomorphine without their consent as a form of "aversive stimuli":

> The drug was administered by intra-muscular injection by a nurse after an inmate had violated the behavioral protocol established for him by the staff. Dr. Loeffelholz testified that the drug could be injected for such cases of behavior as not getting up, for giving cigarettes against orders, for talking, for swearing, or for lying.... When it was determined to administer the drug, the inmate was taken to a room near the nurses' station which contained only a water closet and there given the injection. He was then exercised and within about fifteen minutes he began vomiting. The vomiting lasted from fifteen minutes to an hour.

488 F.2d at 1137.

The Eighth Circuit noted that the same Dr. Loeffelholz involved in this case at-tempted to justify this practice because it had a 50% to 60% effect in modifying behavior. Yet the court recognized that "the mere characterization of an act as 'treatment' does not insulate from Eighth Amendment scrutiny." *Id.* at 1139. After quoting from other courts which refused to excuse unconstitutional punishment when labeled and designed as a form of rehabilitation, the court held that "whether it is called 'aversive stimuli' or punishment, the act of forcing someone to vomit for a fifteen-minute period for committing some minor breach of the rules can only be regarded as cruel and unusual unless the treatment is being administered to a patient who knowingly and intelligently has consented to it." *Id.* at 1139–40.

In addition, the Court has become aware of the well-reasoned Report and Recommendations filed by Magistrate Longstaff in *Herlein v. Reagan,* No. 82–669–D (S.D. Iowa June 21, 1985), which was adopted by Judge Vietor on September 24, 1985.[9] *Herlein* involved a convicted prisoner who was transferred to Oakdale for treatment, where he was placed on virtually the same special treatment program on the B unit as the plaintiff after he became a "disruptive influence." Counsel for the defendants in that case argued that any denial of basic necessities "was a means of regulating plaintiff's behavior during a treatment program designed to treat plaintiff's antisocial behavior." Slip op. at 29. Magistrate Longstaff disagreed, concluding that the plaintiff's right to be free from cruel and unusual punishment was denied. Slip op. at 39. Judge Vietor's adoption of the Report and Recommendations was not appealed.

■■■ The Court recognizes that Mr. Herlein and Mr. Knecht may not have been

---

**9.** The Court regrets that the Iowa Attorney General's office, which represented the defendants in *Herlein* and the defendants in this case, did not bring the *Herlein* case to this Court's attention. The unpublished report and order were discovered by a member of this Court's staff while contacting other judges in this district in a search for jury instructions from similar cases. Ethical Consideration 7–23 of the Iowa Code of Professional Responsibility states in part that "where a lawyer knows of legal authority in the controlling jurisdiction directly adverse to the position of his clients, he should inform the tribunal of its existence unless his adversary has done so...." The Court considers the *Herlein* decision to be a classic example of directly adverse authority, and can only hope that the failure of defendants' counsel in this case to bring it to the Court's attention resulted from a lack of communication among Assistant Attorneys General and not a lack of candor with the Court.

involuntarily committed. However, "once [Green] was admitted as a patient, voluntarily or involuntarily, [he] had a constitutional right to a basically safe and humane living environment." *Goodman v. Parwatikar*, 570 F.2d 801, 804 (8th Cir.1978). "The mere fact that [Green] had been committed under proper procedures does not deprive him of all substantive liberty interests under the Fourteenth Amendment." *Youngberg*, 457 U.S. at 315, 102 S.Ct. at 2457. While he may have been incapable of giving knowing and intelligent consent to treatment or to a deprivation of basic necessities, it does not follow that his consent could be assumed, or that his involuntary commitment waived his waivable constitutional right not to be so deprived. Such a constructive waiver would effectively eliminate the right identified in *Goodman.*

### IV

■ Applying these principles to the present case, the Court finds that the plaintiff is entitled to a judgment n.o.v. against the defendants on the plaintiff's claim that he was deprived of basic necessities in violation of his Fourteenth Amendment rights. This finding is unavoidable in light of the Court's holding that, the defendants were not entitled to an exception to the prohibition against the deprivation of basic necessities, and the defendants' concessions that all defendants but Wright participated in depriving him of basic necessities in late February and early March 1980, and all defendants participated in a similar deprivation in late March and early April 1980. Furthermore, the Court finds that even if the defendants were entitled to a *Bell* exception, evidence that the first period of deprivation was motivated by an intent to deter is so overwhelming that reasonable minds could not differ that the first placement on the B unit did not fall within such an exception. Even under this view of the law, Defendants Lara, Baron, Shea and Kirchhof are liable to the plaintiff.

In reaching this conclusion, the Court recognizes that a judgment n.o.v. is rarely entered, especially on behalf of a plaintiff. *Service Auto Supply Co. v. Harte and Co.*, 533 F.2d 23, 25 (1st Cir.1976). However, most of the premises upon which the parties' theories rest are premises of law, and the defendants conceded the existence of many material facts. While the defendants' intent was an issue, the meaning of the phrase "intent to punish" in *Bell* is a pure question of law for the Court alone to decide.

To determine whether the defendants could have qualified for a safety or security exception for each deprivation, the Court has examined all evidence relating to the plaintiff's initial placement on the special treatment program on February 25, 1980. The most probative evidence of the treatment team's actual purpose is Dr. Lara's February 26th memo to Dr. Loeffelholz which was set out on pages 3 and 4. (Exhibit P). The memo demonstrates the treatment team's dissatisfaction with Mr. Green's past behavioral problems and a desire to "catch Mr. Green's attention or commitment." Furthermore, the assessment portion of the progress notes from the day the treatment team made its initial placement merely states that it "appears that all efforts to date to treat Green have had little effect on his behavior and willingness to change." (Exhibit H at 47). When asked whether the special treatment program was geared toward punishing the plaintiff, Defendant Kirchhof responded that "you know, it was treatment as far as I was concerned. You have to set some limits with a person's behavior. In reading the notes on Mr. Green, unfortunately he was an individual who pushed the limits a lot, and he didn't take notice until you had to set some sort of limitations." The defendants' testimony concerning the setback process, in which Mr. Green was kept at the highest level of deprivation on the B unit longer than expected, is further evidence that Mr. Green was deprived of basic necessities in order to deter him from repeating certain kinds of behavior. The actions which would cause Mr. Green to be set back were described by Dr. Lara as violations (Exhibit P), and in the progress notes as violations of expectations (Exhibit H at 47). Defendant Kirchhof voiced

agreement with his attorney's statement that "if he didn't disobey any rules during the 24–hour period he would have had his blanket." Defendant Wright, speaking generally of the special treatment program, agreed with her attorney's statement that "it was a way of providing incentive for good behavior." She testified that patients must demonstrate twenty-four hours of acceptable behavior or normal behavior to progress onto the next level, and that Green often failed to do this.

This evidence compels the conclusions which *defendants'* counsel made in his closing argument—that the course of treatment was behavior modification through the use of "negative contingencies," that "the purpose of those negative contingencies was to try to urge Mr. Green to proceed in an acceptable fashion," and that "the purpose of having Mr. Green placed on B unit was to try to have Mr. Green change his behavior to meet the common expectations which society imposes upon us all." An intent to deter Mr. Green from performing certain acts is an essential element of these purposes, and reasonable minds could not differ that this intent was at least a substantial or motivating factor in his initial placement.

In an attempt to satisfy the security exception to Instruction 13, the defendants' counsel told the jury that "the defendants also testified that in addition to treating Mr. Green that his clothing and bedding were taken away from him for periods on unit B to make sure that he didn't hurt himself and that there was a security aspect. Dr. Lara testified to that. So did Joan Wright." A thorough review of the testimony of Dr. Lara reveals that he never testified, suggested or implied that Mr.

Green's initial placement on the B unit in February was intended to prevent him from harming himself or anyone else. In fact, he testified that the purpose of the "stringent" conditions on B unit was "so that we could push [Green] out" of segregation more quickly. When examined by his attorney, Dr. Lara testified as to the circumstances surrounding the second placement in B unit. Defendants' counsel did not ask Dr. Lara why Mr. Green was placed in B unit the first time.

The suggestion that Joan Wright testified that the plaintiff was placed in B unit for safety reasons is more disturbing. Wright began her testimony by stating that she was working at another wing of the facility until March 1980, and that she did not become a part of Green's treatment team until March, after Mr. Green's initial placement on the B unit. Thus, even if her testimony was as defendants' counsel described it, that testimony would not have been based on any personal knowledge of the reasons for Green's initial placement; she simply wasn't there at the critical moment of decision. Ms. Wright was permitted, over plaintiff's counsel's objections, to make a statement linking the prevention of suicide and deprivations of clothing and mattresses. But as that testimony demonstrates, she was responding to a question concerning practices and purposes at a different facility where she now works.[10] The plaintiff's counsel objected to this testimony as irrelevant to Mr. Green, and the Court overruled the objection on the assumption that this evidence would be relevant to the plaintiff's malpractice claims, as evidence of the relevant standard of care. If the Court had any inkling that the

---

10. The following exchange took place:

Q. Mr. Green's treatment program involved being placed in a room initially without a blanket or a mattress. Are there any similarities with this program to a behavioral modification program at the University of Iowa Hospitals?

[Plaintiff's counsel objects on relevance ground; objection overruled].

A. If the patient is acutely suicidal or is displaying suicidal behavior then they're not given a mattress and blanket and that would be a dangerous practice, um, so those things

are not utilized if there is reason to think that the patient is going to harm his or herself—I guess that's what comes to mind most readily—or harm some other people, or if it would prevent the observation—suicidal patients take the mattress and put them over the door or take the blanket and put it over the door so you can't observe patients—um, *so those are the things that readily come to mind that are in current practice at the psychiatric hospital.* These things will not be provided if there is a therapeutic reason or a safety reason, then they're not given.

defendants would use this testimony in their closing argument as evidence of the actual purpose behind Mr. Green's placement on the B unit, the Court would have barred its admission under Rule 403 as the most confusing and misleading kind of "similar acts" evidence. Because the evidence should have been inadmissible for the purpose for which it was actually used, the Court must disregard it in determining whether any evidence was presented to the jury which indicates that safety concerns played any role at all in the initial placement of Green in B unit and the deprivations of basic necessities resulting from that decision.

The Court further notes that the purported safety motive was not corroborated by any notation in the plaintiff's progress reports for the period immediately preceding his initial placement in B unit. Those reports are filled with criticisms concerning his behavior, and a type of infraction-sanction routine is readily discernible which supports the Court's conclusion that this placement was motivated substantially or entirely by an intent to deter. Thus, the only evidence in the record which could conceivably give rise to an inference that the initial placement and deprivations of basic necessities were done for safety reasons is the fact that the plaintiff once attempted to commit suicide before coming to Oakdale, and the fact that he was accused of committing terroristic acts several months before in November 1979. There was no evidence presented to show that the risk or fear of suicide had increased in the days immediately preceding the initial placement. While a progress note on February 23 expresses a fear that the plaintiff's frustrations were increasing and that he might strike out, that cannot begin to justify a deprivation of his clothing and bedding once he was safely secluded in a locked chamber, and the defendants failed to even "articulate substantial reasons" why so harsh a deprivation could contribute to the security of the institution other than as a means of special deterrence. *Contrast Goff v. Nix*, 803 F.2d at 366. The fact that none of the defendants involved in the decision testified that it was made for a

protective reason or noted this as a reason for their decision in their reports or memos satisfies this Court that it was not a fact a reason, and that the placement and setback decisions would have been made even if Green had never attempted suicide or had been committed to Oakdale for other reasons. The evidence to the contrary is too weak to support the jury's verdict.

## QUALIFIED IMMUNITY

■ The defendants have raised their qualified immunity as a defense, and proposed to give that question to the jury. The Court ruled that the availability of this defense is a question of law for the Court alone to decide and withheld the question from the jury. The Eighth Circuit recently held that this is the proper approach. *McIntosh v. Weinberger*, 810 F.2d 1411, 1431 n. 8 (8th Cir.1987). The Court now finds that the defendants are not immune.

"Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In *Lappe v. Loeffelholz*, 815 F.2d 1173 (8th Cir.1987), the Eighth Circuit held that an identity or near identity of the facts between cases establishing rights and new cases is not required to defeat immunity. Rather, a flexible approach—"requiring only some factual correspondence and demanding that officials apply well-developed legal principles in carrying out their duties ... strikes a better balance between protecting the official from unexpected liability and promoting the public interest in deterring unlawful conduct." 815 F.2d at 1177.

In *Herlein v. Reagan, supra*, the court held that an Oakdale treatment team's placement of Mr. Herlein on a nearly identical special treatment program on May 8, 1981 violated a right to be free from conditions of confinement constituting cruel and unusual punishment, and that this right was clearly established by the Eighth Cir-

cuit by 1981. Slip op. at 47. It held that "reasonably competent prison officials or officials dealing with inmates should have known the law regarding deprivations of basic necessities." *Id.*

This Court's extensive description of the history of basic necessities law in this district and in this circuit prior to 1980 should indicate the degree to which the right was established when Mr. Green came to Oakdale. In the Court's mind, that right was clearly established. In 1978, the *Wycoff* decision should have settled the question, at least temporarily, of whether safety or security concerns could justify a deprivation of basic necessities. The Court is not persuaded that the *Bell* decision the next year involving far less demeaning practices would have muddied those waters in the mind of a reasonable person. But assuming that *Bell* raised a legitimate question of whether its weaker standard could be generalized to basic necessities cases, the Court is convinced that there was no legitimate question that *Bell* would not authorize harsh conditions intended to punish pretrial detainees prior to an adjudication of guilt, and that deterrence is not a legitimate nonpunitive governmental purpose.

Furthermore, a reasonable person at Oakdale who wondered whether a "treatment" exception to *Wycoff* and *Bell* existed would have come across or recalled the *Knecht* decision, which rejected the logical underpinnings of such a theory. Any reasonable person who wondered whether the involuntary commitment of Mr. Green waived or suspended his substantive constitutional rights should have believed otherwise after reading *Goodman.*

*Harlow* and its progeny effectively shield government officials from unexpectable liability to plaintiffs who use § 1983 to bring test cases. If this was a test case at all, it was a test case for the defendants, a case to test the continuing vitality of the clearly established view of this court and the Eighth Circuit that deprivations of the kind suffered by Mr. Green are unconstitutional. Courts can be persuaded to change clearly established law, but plaintiffs and defendants must assume the risk that courts will follow it, and act accordingly.

## MOTION FOR A NEW TRIAL

Under Rule 50(c) the Court must also rule on the plaintiff's motion in the alternative for a new trial on the constitutional claims. As the findings above demonstrate, the jury's special verdicts on the second and third constitutional claims involving deprivation of basic necessities and punishment prior to an adjudication of guilt were against the clear weight of the evidence. For this reason, the Court finds that if its judgment n.o.v. is reversed on appeal, the plaintiff is entitled to a new trial on those claims.

■ The Court also finds that the plaintiff is not entitled to a new trial on his claim of deliberate indifference to serious medical needs. Each side presented competent evidence concerning the prudence of injecting the plaintiff with prolixin without using cogentin to remedy its side effects. The Court recognizes that Dr. Lara was concerned that cogentin would have negative side effects of its own, and that the nature of the side effects suffered by Mr. Green was well disputed. In short, there is a battle of experts on this question, and a reasonable jury could have reached either conclusion.

■ Because the Court has entered a judgment n.o.v. on the plaintiff's second claim and has found that the defendants are not entitled to immunity, it must decide how the damage questions should be resolved. Although the plaintiff made the initial jury demand, he now asks the Court to decide how much he is entitled to. The defendants assert that they are entitled to a jury trial on the question of damages. The Court believes the defendants are constitutionally entitled to a jury trial on the damage questions, *see Rheuport v. Ferguson,* 819 F.2d 1459, (8th Cir.1987), and that they have not waived this right simply by failing to make a jury demand of their own once one was made by the plaintiff. If the parties believe additional discovery is warranted in light of the Court's order, they should notify it. In the meantime, the

Clerk of Court shall set this matter for a jury trial on the plaintiff's prayer for compensatory and punitive damages.

IT IS THEREFORE ORDERED that the plaintiff's motion for a judgment n.o.v. on claim that he was unconstitutionally deprived of basic necessities is granted.

IT IS FURTHER ORDERED that the plaintiff's motion for a new trial in the alternative is conditionally granted with regard to the plaintiff's basic necessities claim and his claim that he was punished prior to an adjudication of guilt, and is denied with regard to the plaintiff's deliberate indifference claim.

IT IS FURTHER ORDERED that the Clerk of Court shall set this matter for a jury trial on the plaintiff's prayer for compensatory and punitive damages.