### Terry L. FRIENDS, Plaintiff,

### v.

### Dick D. MOORE, et al., Defendants.

### No. 90–0934–C (5).

United States District Court,
E.D. Missouri, E.D.

Oct. 17, 1991.

---

Robert G. Kister, Dodson, Breeze, Kister, Festus, Mo., for plaintiff.

J. Michael Waller, Scott Huber, Sp. Asst. Atty. Gen., St. Louis, Mo., for defendants.

## MEMORANDUM AND OPINION

LIMBAUGH, District Judge.

Plaintiff, an inmate at Potosi Correctional Center, brought this action pursuant to 42 U.S.C. § 1983 against various prison officials. Plaintiff's first amended complaint claims that defendants violated his constitutional rights by 1) beating him; 2) refusing him medical treatment after the beating; and 3) confining him for more than forty minutes in an outdoor recreation yard with no clothes after he was drenched with water. Plaintiff expressly waived his right to a jury trial and this case was tried before this Court sitting without a jury on January 3 and 4, 1991. This Court, having now considered the pleadings, the testimony of the witnesses, and the documents in evidence, hereby makes the following findings of fact and conclusions of law as required by Rule 52.

## FINDINGS OF FACT

Plaintiff Terry L. Friends is an inmate currently incarcerated by the Missouri Department of Corrections and Human Resources. Plaintiff has been in prison since age 18 for various felony crimes, including violent crimes. At the time of trial, he was

thirty years old. Since August 10, 1989, plaintiff has been incarcerated at the Potosi Correctional Center ("PCC"), which is a maximum security facility.

At all relevant times, defendant Dick Moore was the Director of the Missouri Department of Corrections and Human Resources, defendant George Lombardi was the director of the Division of Adult Institutions, and defendant Paul Delo was the superintendent at PCC.

At all relevant times, defendant Lonnie Salts was a corrections officer III at PCC. In October 1989, he was in charge of Unit I at PCC, which housed Phase I prisoners, including plaintiff. His immediate supervisor was defendant Captain Jerry Pulliam, a corrections supervisor I at PCC. Defendant Larry Scott was a functional unit manager at PCC. Defendant Michael Bowersox was the acting assistant superintendent of PCC.

During October 1989, plaintiff was assigned to "Phase I," a designation for problem prisoners, because of his persistent behavioral problems at other prisons, including assault of guards and concealment of weapons. The guards regarded him as a problem prisoner. Lt. Lonnie Salts knew plaintiff for several years, from the time plaintiff was incarcerated at the maximum security Missouri State Penitentiary. Salts testified that plaintiff had a reputation as a problem prisoner and that he was cited for conduct violations "almost constantly."

In October 1989, plaintiff was about 6 foot 2 inches tall and weighed about 205 pounds. He admits sometimes having difficulty controlling his temper. At various times, prison physicians had prescribed him medications for behavior control. Plaintiff cannot read or write well.[1] He stated that some of his past outbursts were attempts to get the attention of the warden to complain about actions of the guards. Since plaintiff could not read or write, he could not file a written grievance. He would ask the guards to see the warden, but they would laugh at him. He said he would then create a disturbance to get attention for his complaint.

On October 14, 1989, prison officials became aware that a Unit I inmate, Kevin Crump, had freed himself from handcuffs and leg restraints which were missing. Crump was housed about three or four cells down from plaintiff. The missing restraints caused serious concern about security because it indicated an inmate had a cuff key. Prison officials searched cells throughout Unit I to find the missing handcuffs and restraints. Later that day, at about 6:50 p.m., the missing restraints turned up—on plaintiff. Plaintiff called Capt. Norma Lavrrar to his cell and showed her the hand cuffs, which he was wearing on his arms in front. She asked him if he had anything else and he showed her the leg restraints, which he was also wearing. She again asked him if he had anything else. He smiled and said "I can't give it to you now."

Plaintiff testified that he wore the restraints and had the key to protest certain actions by prison officials. In his opinion, they were misusing their authority by leaving prisoners in handcuffs and shackles, leaving them stripped in their cells, and feeding them in paper bags.[2] Plaintiff attempted to "bargain" with prison officials for a blanket and clothing for inmate Crump, whose clothing and furnishings prison officials had removed because Crump was on strip cell status.[3]

The cells in Unit I are constructed so that an inmate must back up to the door and place his hands or legs near in a "chuckhole" for guards, outside the cell, to put on and take off restraints. Plaintiff

---

1. A fellow inmate aided plaintiff in writing his initial complaint.

2. Plaintiff testified that he had no intent to leave the institution or escape. He said the homemade key worked only on institutional cuffs and shackles and not on restraints used by federal officials.

3. A report by Lt. Lonnie Salts stated that the restraints were left on Crump due to his hostile behavior and assaultive actions earlier in the shift. Reports from guards show that as of 4 p.m. Crump was wearing the restraints. There was no explanation for how the restraints got from Crump to Friends.

voluntarily relinquished the restraints, which had been damaged. The guards removed the restraints from him, using bolt cutters to cut off the handcuffs. The guards suspected that plaintiff also possessed a homemade cuff key, but he failed to produce it. The guards removed plaintiff from his cell and searched the cell. The search revealed that plaintiff's state-issued mattress was destroyed, so it was removed from the cell.

The guards then took plaintiff to the medical services department at PCC for X-rays. The X-rays revealed a metallic foreign body in plaintiff's stomach which was believed to be a cuff key. Defendants ended the search for the key, returned plaintiff to his cell, and placed him on a 24–hour "defecation watch" in an attempt to recover the key after it had passed through his system. The water supply to plaintiff's cell was turned off and correctional officer Greg Connaway was assigned to examine plaintiff's feces for the key. Plaintiff was already on 24–hour lockdown within his cell, which meant he received his meals within his cell and was denied contact with other inmates. After the search, the guards issued plaintiff conduct violations for tampering with locking or safety devices, destroying state property, and theft for possession of the cuff key.

Plaintiff remained on defecation watch from about 7 p.m. on October 14 and throughout October 15. By the morning of October 16, 1989, plaintiff had been on defecation watch for about thirty-six hours. He had not had a bowel movement and defendants had not recovered the cuff key. That morning, defendants again had plaintiff X-rayed. The X-rays indicated that the cuff key remained in plaintiff's digestive tract. After the X-rays, plaintiff was returned to his cell.

Salts was the acting watch commander on October 16 and in charge of all the guards on duty that day. At about 8:30 a.m., Salts directed another search of plaintiff's cell in an effort to recover the key. At that point, plaintiff had been back from the medical facility for X-rays and in his cell for only a few minutes. To facilitate

the search, plaintiff voluntarily submitted to the placement of leg restraints and handcuffs on him. Plaintiff was then taken to recreation room four ("rec area"), a walled-in area located outdoors within the prison complex, during the search.

At about 9:08 a.m., plaintiff's cell was searched while he was on the rec area. During that search guards discovered that plaintiff had damaged one pair of state shoes, three state sheets, three T-shirts and two pairs of state pants. There was no evidence as to when this damage occurred. Plaintiff said it had been damaged for a couple of weeks, that he had already been disciplined for it, but the property was never replaced. The guards wrote up a conduct violation for destruction of state property and Salts signed it. Salts informed Pulliam of the damaged property in plaintiff's cell. Pulliam informed his supervisor, Capt. John R. Powell, of the situation and recommended strip cell status. Powell went to his supervisor, Michael Bowersox, who approved it. Within minutes, Pulliam instructed Salts to put plaintiff on strip cell status and that his clothing be removed.

Prison policy defines a "strip cell" as "[a] cell which contains no furnishings, bedding, or equipment." July 12, 1989 Memorandum from Michael Bowersox to Mike Guerin ("strip cell policy"). The policy also sets out procedures for strip cell status.

> The following are the only conditions or events which gives (sic) cause for strip cell placement:
>
> 1. Suicide—the act or an instance of attempt to intentionally kill oneself. This includes one who verbalizes suicidal ideation.
>
> 2. Violence—physical force exerted for the purpose of violating, damaging or abusing.

Strip cell policy.

Salts and another guard went to plaintiff in the rec area and told him to remove his clothes. He said he would not strip there. The guards left and returned about 5 minutes later and asked plaintiff to back up to the chuckhole to cuff up, which he did. They told him to stand in the hall a couple of minutes while guards removed every-

thing from his cell. He complied. After they finished, the guards then returned plaintiff to his cell and removed the restraints.

At this point, plaintiff was alone in his cell which was stripped of its contents. Salts ordered plaintiff to remove his clothing. Plaintiff refused.[4] Salts then instructed him to allow the restraints to be placed back on him. Plaintiff again refused. At this point, Salts said he believed he observed a pen in plaintiff's shirt pocket. He said he did not notice it until he put plaintiff back in his cell.[5]

Under the inmate rules of PCC, an inmate disobeys an order when he fails to comply with an order or instruction of any staff member. On the morning of October 16, 1989, at about 9:30 and 9:40 a.m. respectively, Salts issued plaintiff two conduct violations for disobeying orders: one for refusing to remove his clothes and one for refusing to submit to restraints. He informed his supervisor, Pulliam, about Friends refusal to remove his clothes and his refusal to submit to the restraints. He did not tell him about the pen at this time.

At about 9:40 a.m., Pulliam ordered Salts to form a "movement team." A movement team is made up of five prison guards wearing helmet shields and protective clothing. Their function is to approach and subdue an inmate by use of physical force. Prison regulations limit when physical force can be used against an inmate.

Physical force will be used only to the minimum degree necessary to prevent the commission of a misdemeanor or felony within the institutional perimeter, to prevent an act which could result in death or great bodily harm, to prevent serious damage to property, to enforce institutional rules, to prevent or quell a riot, to secure an inmate, or to defend against nondeadly assault.

Policy 20–110.060(3)(A).

Pulliam decided to form a movement team based on plaintiff's refusal to obey orders.[6] Salts was responsible for the supervision and direction of the team. Each guard on the movement team, according to procedure, was assigned to immobilize a specific part of plaintiff's body. Salts assigned officer David McPeak as the lead man of the movement team, responsible for immobilizing plaintiff's torso.[7] Salts instructed McPeak to use a 3–foot by 2–foot plexiglass "body shield" because of the possibility that plaintiff might use a pen as a weapon to defend himself.

The remainder of the movement team was made up of Ron French, assigned to subdue plaintiff's right arm; James Wehmeyer, assigned to subdue plaintiff's left arm; Steve Bingham, assigned to subdue plaintiff's right leg; and, Jim McGinley, assigned to subdue plaintiff's left leg and carry the handcuffs and leg restraints. Corrections officer Kenneth Baugh was assigned to operate a video camera.

---

**4.** Plaintiff told the guards that it was against his constitutional rights to make him strip, that they must have a psychologist order to do that. He testified that he knew he was violating a rule by refusing to strip, but that he believed the order violated his rights.

**5.** No one else saw plaintiff with a pen at any time. Plaintiff testified he was wearing tennis shoes, cut-off pants and a cut-off T-shirt without a pocket. He said his knees and wrists were wrapped with strips of sheets. He testified he did not have a pen, although he previously had pens in his cell, those were taken out when his cell was stripped.

**6.** Prison regulations require a written report for each use of force against an inmate. In his use of force report, Pulliam stated that his decision to form the movement team was based on plain-

tiff's refusal to obey an order. At trial, he stated that he also considered that plaintiff had a pen that he might use as a weapon. However, the use of force report indicated that Pulliam was not advised of the possibility of the pen until fifteen minutes after forming the movement team. Salts testified he understood the movement team was formed in order to recover plaintiff's clothing.

**7.** When Salts made this assignment, he knew that plaintiff previously assaulted McPeak and that McPeak was the chief complaining witness in a pending felony prosecution against plaintiff. Salts testified that he did not consider that fact when he made the assignment. McPeak testified, quite incredibly, that as he lead the movement team into plaintiff's cell he did not think about the fact that plaintiff had previously assaulted him.

Standard procedure is that the actions of a movement team are videotaped. The purpose is to record what happens in the event that a guard is injured or the inmate files a lawsuit. Baugh testified that on this occasion, the videocamera stopped working about four to five seconds after the movement team entered plaintiff's cell.[8] He said that he had checked the camera that day to make sure it was working. He tried to get the camera to work, but had no success and decided it was defective. Baugh gave the tape to Pulliam, who viewed it, then delivered it Powell. Neither the camera nor the tape were available at trial.[9]

In addition to the videotape by the camera operator, the Unit I hallway is constantly monitored by video cameras. The recording tape automatically re-records and erases itself unless prison personnel preserve the tape shortly after the event by taking it out. No one preserved the tape which recorded the statements and actions of the parties immediately prior to the movement team entering plaintiff's cell.

The movement team entered the cell about 10:01 a.m. The testimony regarding the actions of the movement team varied.

Salts observed the movement team from the hallway. His version is that plaintiff was couched on the shower cell just before the team entered the cell, then he jumped down. The team entered plaintiff's cell and McPeak walked into plaintiff. Both plaintiff and McPeak fell to the ground side by side. Plaintiff resisted and tried to strike the guards, but did not inflict any injuries. Plaintiff said numerous times he would kill them, particularly McPeak. Salts never saw the guards strike plaintiff. When plaintiff was restrained on the floor, nurse Connie Barton came in to check for injuries. Plaintiff had some blood about his face, but Salts didn't know how it got there. Plaintiff told Barton that he was

not hurt and that he did not need treatment.

McPeak's version is that he struck plaintiff with the body shield in the center of his cell and drove him to the back wall of his cell pinning him against the wall. He and the other officers then wrestled plaintiff to the floor. After plaintiff was forced onto the floor by the movement team he was placed in restraints. At that time plaintiff began making threatening statements. The movement team then stripped off plaintiff's clothing and conducted a full strip search. Plaintiff's nose was bloody and there was blood on the floor, but McPeak did not know how that happened. When nurse Barton entered the cell, plaintiff told her he was all right.

Plaintiff's version is that Pulliam came to the cell door and asked plaintiff if he was ready. Pulliam told plaintiff that if he did not strip, he would get the movement team. He responded, "let the show begin." After the team entered, McPeak hit him with the shield, pinned him to the wall, then grabbed him and threw him to the wall. Then they put restraints on him and McPeak punched him, spit on him and called him racist names.[10] This lasted five to ten minutes. Plaintiff did not resist until McPeak punched him. Someone then pulled his legs all the way back to his buttocks; at that point, plaintiff stopped resisting. The guards hurt his testicles, face, neck, lower body and legs. When nurse Barton entered the cell, McPeak had his hand over plaintiff's mouth, so he was unable to ask for help. He never did say he was all right.

Two nearby inmates also testified about what they heard during the incident. Crump said he heard the guards ask for plaintiff's clothes and he refused. About thirty minutes later, they came back and entered his cell. He heard someone hit plaintiff, then plaintiff said "you'll have to

**8.** On direct examination Baugh testified that he did not notice that the videocamera was malfunctioning until the movement was complete. On cross examination, he stated that after the camera stopped working, he continued to point it into the cell so that the inmate would think it was running.

**9.** Plaintiff subpoenaed defendant Delo to produce at trial the videocamera used during this incident, but he failed to do so.

**10.** Plaintiff is black; McPeak is white.

hit me harder than that." Christopher Cowans, who was about three cells away also heard the request for plaintiff's clothes and his refusal. He later heard plaintiff say "punch me harder, hit me harder."

There was no dispute that after plaintiff was in restraints, nurse Connie Barton entered the cell at about 10:08 a.m. and examined plaintiff for injuries.[11] Barton noted that plaintiff had a bloody nose, but no visible injuries. After the nurse examined plaintiff, the movement team left at about 10:12 a.m. and plaintiff's restraints were removed.

Plaintiff was now in his cell with no water, no equipment, no furnishings and no clothes. About 45 minutes after the movement team left, plaintiff activated the fire sprinkler system in his cell, causing flooding of the entire B-wing. Plaintiff allowed himself to be placed in restraints by prison personnel. At Pulliam's direction, prison personnel placed him onto the rec area so that plaintiff's cell and the unit could be cleaned up. Plaintiff was wet and naked and left in the outdoor rec area between 40 minutes and two hours. The temperature was about 60 degrees. Plaintiff testified it was drizzling rain; Salts said it was clear.

While plaintiff was in the rec area, his behavior was monitored by a camera there and recorded on video tape. This tape was available and shown at trial.[12] The rec area has no roof, but is surrounded by walls. During the time in the rec area, plaintiff was like a caged lion walking back and forth and around the room. Throughout this time, he would shout threats and obscenities. Nothing in the tape showed plaintiff suffering. He did not appear uncomfortable, cold or in any kind of discomfort. There was no indication that rain or mist was falling or that there was any kind of inclement weather.

Plaintiff was returned to his cell. Shortly thereafter he received a personal letter for Bowersox threatening him with criminal prosecution for attempted escape if he did not produce the cuff key before midnight on October 16. At about 7:20 p.m. on October 16, plaintiff relinquished the cuff key to corrections officer Brad Gibson. Plaintiff said he gave the key to Gibson because he was the only who asked for it. Gibson then issued plaintiff a conduct violation for contraband. After he turned over the key, the water in his cell was turned back on.

At about 8 p.m. on October 16, nurse Barton again examined plaintiff at the door of his cell. He had complained that his face and everything was messed up. She noted a slight swelling at the bridge of his nose, but no respiratory problems. She concluded plaintiff had no serious medical problems.

The next day, plaintiff received conduct violations for creating a disturbance and tampering with locking or safety devices for destroying the sprinkler head. Plaintiff remained on strip cell status. Although he had no clothing, bedding or furnishings, the lights were working, there was air conditioning and he got three meals a day in a paper sack. On the morning of October 18, 1989, plaintiff was taken off strip cell status. He took back his clothing, mattress, blanket and pillow, but refused his personal items. After hearings on October 20, 1989, plaintiff was found guilty of all offenses in the conduct violations related to these events and sanctions were imposed.

---

**11.** Prison regulations require that when physical force is applied, the inmate being subdued shall be examined by medical staff as soon as possible for any physical injuries or side effects. If an injury is obvious following the use of force, medical attention shall be given immediately following the incident. Adult Institutions Policy ("Policy") 20–110.060(2)(B)(4). Prison regulations also require the medical personnel who examined the inmate to complete and sign the medical section of the use of force report. Policy 20–110.060(2)(B)(5).

**12.** Although the tape from the hallway prior to the movement was not preserved, Pulliam made the decision to preserve the videotape of plaintiff in the rec yard. He gave it and the short tape of the movement team to Powell. Pulliam said he was told later that there was no tape in the hall cameras during the movement.

## CONCLUSIONS OF LAW

This Court has jurisdiction of this cause under 42 U.S.C. § 1983. The defendants acted under the color of state law.

Plaintiff's first amended complaint claims that defendants violated his constitutional rights by 1) beating him; 2) refusing him medical treatment after the beating; and 3) confining him for more than forty minutes in an outdoor recreation yard with no clothes after he was drenched with water.

The Court sustained the motion for directed verdict at the close of plaintiff's evidence with respect to defendants Moore, Lombardi, Delo, Scott and Bowersox, but overruled it as to defendants Salts and Pulliam. The remaining defendants moved for judgment at the close of all the evidence. That motion was taken with the case.

### I. *Excessive Use of Force*

■ Plaintiff's first claim is that defendants used excessive force against him when the movement team entered his cell to strip him. Prison officials have considerable discretion in preserving order and discipline and controlling recalcitrant inmates such as plaintiff. *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979).

> It must be realized, however, that prison administrators are required to deal in a constitutional manner with convicts who are violent and unruly as well as with those whose conduct is exemplary or at least peaceful. And while prison officials must have some latitude in imposing conditions reasonably necessary to control a prisoner's behavior, the contributory fault of an inmate does not necessarily deprive him of his right to relief from deprivations of constitutional dimension.

*Wycoff v. Brewer,* 572 F.2d 1260, 1267 (8th Cir.1978).

■ Reasonable measures undertaken to resolve a disturbance when the disturbance indisputably poses significant safety risks do not rise to the level of cruel and unusual punishment. *See Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986). An eighth amendment claimant must prove unnecessary and wanton infliction of pain. *Id.* No cruel and unusual punishment exists where force is applied in a good-faith effort to maintain or restore discipline. *Cowans v. Wyrick,* 862 F.2d 697, 699–700 (8th Cir.1988). "Cruel and unusual punishment exists, in the context of prison security, only where force is applied maliciously and sadistically for the very purpose of causing pain and suffering." *Cowans,* 862 F.2d at 700.

■ Here, prison officials decided to send a movement team into plaintiff's cell because he had repeatedly refused orders. Plaintiff's defiance occurred during a series of events indicating a serious security risk. Plaintiff previously had produced missing restraints, which lead defendants to believe that plaintiff had a cuff key in his possession and X-rays of plaintiff supported that suspicion. In the judgment of prison officials, the movement team was needed to restore order. The Court will not interfere with that judgment.

The question is whether the degree of force used was reasonable or excessive. By plaintiff's account, McPeak led a malicious and sadistic attack on him. By defendants' account, the force was only that necessary to subdue plaintiff. Neither version was completely believable. The videotapes of the event would tell the true tale. However, by some coincidence, neither the camera operator's tape nor the tape of the hallway was available at trial, which casts suspicion on the credibility of defendants' story. Nonetheless, plaintiff's only injury appeared to be a bloody nose, which easily could have occurred during the scuffle of the guards attempting to place restraints on him. In light of the security risk present in the prison at the time, the use of force was exercised as needed to restore order. The evidence did not show the force was used sadistically and maliciously merely to inflict pain. Therefore, plaintiff failed to prove defendants used such force against him that would violate the Constitution.

## II. *Denial of Medical Care*

Plaintiff's second claim is that defendants denied him medical care after the movement team entered his cell. To sustain this claim, plaintiff must show that defendants were deliberately indifferent to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), *reh'g denied*, 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1977); *Noll v. Petrovsky*, 828 F.2d 461 (8th Cir.1987), *cert. denied*, 484 U.S. 1014, 108 S.Ct. 718, 98 L.Ed.2d 668 (1988). The evidence was that a nurse examined plaintiff for injuries while the movement team was still in the cell. She returned again later that evening and examined him again. She concluded that he suffered a bloody nose, but that it resulted in no respiratory problems. She found no other injuries. Plaintiff received prompt medical attention after the movement team entered his cell and follow up care later that same day. Therefore, plaintiff has failed to show that defendants were deliberately indifferent to his serious medical needs.

## III. *Confinement Outdoors Without Clothing*

Plaintiff's final claim is that his confinement in an outdoor rec area wet and naked for a period of less than two hours constitutes cruel and unusual punishment. The Supreme Court has stated that the Eighth Amendment prohibits punishments that "deprive inmates of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). "The eighth amendment prohibits prison conditions that 'involve the wanton and unnecessary infliction of pain,' or that result 'in unquestioned and serious deprivations of basic human needs.'" *Johnson v. Boreani*, 946 F.2d 67, 70 (8th Cir.1991) (quoting *Wycoff*, 572 F.2d 1260).

The Eighth Circuit has held that the eighth amendment is violated in strip cell cases only if, after viewing the totality of the circumstances, including the extent of plaintiff's injuries, the fact finder concludes that defendant's conduct "was so inhumane, base, or barbaric so as to shock one's sensibilities." *Porth v. Farrier*, 934 F.2d 154, 157 (8th Cir.1991). *See also Maxwell v. Mason*, 668 F.2d 361, 65–66 (8th Cir.1981) (eight amendment violated when inmate confined in undershorts for fourteen days clearly for punitive reasons); *Wycoff*, 572 F.2d at 1266 (inmate confined in strip cell for two months). The eighth amendment would be violated if a prisoner was confined to a strip cell under conditions sufficiently deplorable as to offend modern standards of human decency. *Johnson*, 946 F.2d at 70. The length of time a prisoner is exposed to harsh confinement is an important factor. *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir.1989) (citations omitted).

In examining plaintiff's claim, the Court is cognizant that its inquiry is limited to the question whether constitutional violations have occurred and may not reflect the Court's idea of how best to run the prison. *Bell*, 441 U.S. at 539, 99 S.Ct. at 1874. "How best to operate a penal institution ordinarily is a matter for prison officials to decide and [a court] will interfere only when a prisoner has proven the officials have clearly exceeded constitutional boundaries." *Johnson v. Williams*, 788 F.2d 1319, 1325 (8th Cir.1986). In determining the constitutionality of the defendants' actions here, the Court must consider whether they were taken for reasons of punishment or were merely incident to other legitimate governmental reasons. *Bell*, 441 U.S. at 538, 99 S.Ct. at 1873–74.

In this case, the conditions of plaintiff's confinement in the rec area were no doubt harsh. While the treatment of plaintiff was not ideal, however, it was not constitutionally infirm according to the current standards set out by the Eighth Circuit. First, it appears that defendants placed plaintiff in the rec area not for punishment, but to restore order in the unit. Plaintiff was moved from his cell to the rec area to facilitate the clean up of his unit, which he necessitated by setting off the sprinkler. Further, the duration of the confinement was relatively brief. Plaintiff claims he was in the rec area for two hours; defendants say it was only forty minutes. Final-

ly, there was no evidence that the conditions of confinement caused plaintiff to be cold, or in any kind of discomfort. After viewing the totality of the circumstances, including the extent of plaintiff's injuries, the Court cannot conclude that defendants' conduct "was so inhumane, base, or barbaric so as to shock one's sensibilities." *Porth*, 934 F.2d at 157. Therefore, plaintiff failed to prove that the conditions of his confinement in the rec area violated the Constitution.

For the foregoing reasons, the Court enters judgment in favor of defendants and against plaintiff on the merits of plaintiff's complaint.